**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **JOSHUA PORTER, SHARKEY SIMMONS, and EMANUEL COLAJAY RIVERA Individually and on Behalf of All Others Similarly Situated,** | |
| **Plaintiffs,** | 17 Civ. 7405 (KAM)(VMS) |
| **-against-** | |
| **MOOREGROUP CORPORATION, BALDWIN HARBOR CONTRACTING INC., JOHN MOORE, GARY MOORE and MARTIN MOORE, Jointly and Severally,** | |
| **Defendants.** | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

**PELTON GRAHAM LLC**
Brent E. Pelton
Taylor B. Graham
111 Broadway, Suite 1503
New York, New York 10006
Telephone: (212) 385-9700

*Attorneys for Plaintiffs, the FLSA Collective
and putative Class*

TABLE OF CONTENTS

**Page**

Table of Authorities ............................................................................................... iii

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF THE CASE ............................................................................... 2

I.     Course of Proceedings ............................................................................... 2

II.    Relevant Facts ............................................................................................ 4

      A.     Defendants' Construction Business ................................................ 4

      B.     Plaintiffs' Construction Work for Mooregroup ............................. 7

      C.     Defendants' Timekeeping, Recordkeeping, and Wage Notification
             Practices ......................................................................................... 8

            1.     Mooregroup's Timekeeping and Recordkeeping Practices ......... 8

            2.     Defendants Failed to Provide Wage Statements and Wage Notices ............ 9

      D.     Defendants' Unlawful and Ongoing Classwide Pay Practices ............................. 11

            1.     Plaintiffs and the Putative Class Typically Worked Well Beyond
               Forty Hours Per Week ...................................................................... 11

            2.     Mooregroup's Wage Payment Practices are Common and
               Consistent for All Plaintiffs and Putative Class Members ........................ 12

            3.     Mooregroup Routinely Engaged in Overtime Violations by Failing
               to Pay Overtime Premiums and Failing to Pay for All Hours
               Worked ........................................................................................... 14

ARGUMENT ......................................................................................................... 16

I.     THIS COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION OVER
      PLAINTIFFS' STATE LAW CLAIMS ............................................................ 16

II.     THIS COURT SHOULD CERTIFY PLAINTIFFS' NYLL CLAIMS AS A RULE
      23(B)(3) CLASS ACTION ............................................................................... 18

      A.     Rule 23(a)(1): Numerosity ............................................................. 19

      B.     Rule 23(a)(2): Common Questions .................................................. 20

C.     Rule 23(a)(3): Typicality ........................................................................21

D.     Rule 23(a)(4): Adequacy of Representation ...........................................22

E.     Rule 23(b)(3): Common Questions Predominate ...................................23

   1.   Common Questions Predominate With Respect to Liability for
        Plaintiffs' Claims..............................................................................24

   2.   Common Questions Predominate With Respect to Damages.........25

F.     Rule 23(b)(3): Superiority.......................................................................26

III.   PLAINTIFFS' COUNSEL SHOULD BE APPOINTED AS CLASS COUNSEL.........28

CONCLUSION……………………………………………………………………..28

# TABLE OF AUTHORITIES

**Page**

CASES

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997)....................................................................................................23

*Ansoumana v. Gristede's Operating Corp.*,
  201 F.R.D. 81 (S.D.N.Y. 2001) ..........................................................................18, 26

*Caridad v. Metro-North Commuter Railroad*,
   191 F.3d 283 (2d Cir.1999)................................................................................18, 21

*Chime v. Peak Sec. Plus, Inc.*,
  137 F. Supp. 3d 183 (E.D.N.Y. 2015) ......................................................................20

*Consol. Rail Corp. v. Town of Hyde Park*,
  47 F.3d 473 (2d Cir.1995)..........................................................................................19

*Cordes & Co. Financial Services, Inc. v. A.G. Edwards & Sons, Inc.*,
  502 F.3d 91 (2d Cir. 2007).........................................................................................22

*Damassia v. Duane Reade, Inc.*,
  250 F.R.D. 152, 156 (S.D.N.Y. 2008) ........................................................18, 21, 22

*Garcia v. Pancho Villa's of Huntington Village, Inc.*,
  281 F.R.D. 100, 105 (E.D.N.Y. 2011) ......................................................................20

*Gortat v. Capala Bros.*,
  2010 U.S. Dist. LEXIS 35451 (E.D.N.Y. Apr. 9, 2010) .........................................18

*Guzman v. VLM, Inc.*,
  No. 07-cv-1126, 2008 U.S. Dist. LEXIS 15821 (E.D.N.Y. Mar. 2, 2008)..............26

*Indergit v. Rite Aid Corp.*,
  293 F.R.D. 632 (S.D.N.Y. 2013) ...............................................................................27

*In re Beacon Assocs. Litig.*,
  282 F.R.D. 315 (S.D.N.Y. 2012) ...............................................................................19

*In re Nassau County Strip Search Cases*,
  461 F.3d 219 (2d Cir. 2006).................................................................................24, 26

*In re Visa Check/Mastermoney Antitrust Litig. v. Visa U.S.A. Inc.*,
  280 F.3d 124 (2d Cir. 2001)........................................................................................28

*Johnson v. Brennan*,
   No. 10-cv-4712, 2011 U.S. Dist. LEXIS 105775 (S.D.N.Y. Sept. 16, 2011) ........................25

*Lassen v. Hoyt Livery, Inc.*,
   No. 13-cv-1529, 2014 U.S. Dist. LEXIS 129784 (D. Conn. Sept. 17, 2014) .................. 25-26

*Lee v. ABC Carpet & Home*,
   236 F.R.D. 193, 204 (S.D.N.Y. 2006) .................................................................................22

*Lewis v. Alert Ambulette Service Corp.*,
    2012 U.S. Dist. LEXIS 6269 (E.D.N.Y. Jan. 19, 2012) .................................19, 20, 22, 24, 25

*Lin v. Benihana N.Y. Corp.*,
   No. 10-cv-1335, 2012 U.S. Dist. LEXIS 186526 (S.D.N.Y. Oct. 23, 2012)......... 18, 22-23, 24

*Marisol A. v. Giuliani*,
   126 F.3d 372 (2d Cir. 1997).................................................................................................21

*Mendez v. Radec Corp.*,
   260 F.R.D. 38 (W.D.N.Y. 2009)..........................................................................................18

*Meyers v. Crouse Health Sys.*,
   274 F.R.D. 404 (N.D.N.Y. 2011) ...................................................................................18, 26

*Meyer v. United States Tennis Ass'n.*,
   297 F.R.D. 75 (S.D.N.Y. 2013) ...........................................................................................18

*MMT Sales, Inc. v. Channel 53 Inc.*,
   No. 92-cv-7207,  1993 U.S. Dist. LEXIS 18208 (S.D.N.Y. Dec. 27, 1993) ..........................16

*Morangelli v. Chemed Corp.*,
   275 F.R.D. 99 (E.D.N.Y. 2011) ...........................................................................................21

*Moore v. Paine Webber, Inc.*,
   306 F.3d 1247 (2d Cir. 2002).................................................................................. 21, 23-24

*Morris v. Alle Processing Corp.*,
   No. 08-cv-4874, 2013 U.S. Dist. LEXIS 64534 (E.D.N.Y. 2013) .........................................18

*Myers v. Hertz Corp.*,
   No. 02-cv-4235, 2007 U.S. Dist. LEXIS 53572 (E.D.N.Y. July 24, 2007)............................21

*Noble v. 93 Univ. Place Corp.*,
   224 F.R.D. 330 (S.D.N.Y. 2004) .........................................................................................27

*Poplawski v. Metrople on the Atlantic, LC*,

iv

No. 11-cv-3765, 2012 U.S. Dist. LEXIS 46408 (E.D.N.Y. Apr. 2, 2012) ...........................20

*Promisel v. First American Artificial Flowers Inc.*,
  943 F.2d 251 (2d Cir. 1991)..................................................................................16

*Ramirez v. H.J.S. Car Wash, Inc.*,
  2013 U.S. Dist. LEXIS 51344 (E.D.N.Y. April 9, 2013) ......................................17

*Ramos v. SimplexGrinnell LP*,
  796 F. Supp. 2d 346 (E.D.N.Y. June 21, 2011) .....................................................1

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993)..................................................................................20

*Shabazz v. Morgan Funding Corp.*,
  269 F.R.D. 245 (S.D.N.Y. 2010) ..........................................................................25

*Shahriar v. Smith & Wollensky Restaurant Group, Inc.*,
  659 F.3d 234 (2d Cir. 2011)...............................................................16, 17, 21, 27

*United Mine Workers v. Gibbs*,
  383 U.S. 715 (1966)..............................................................................................16

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S.Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011) ................................................20

*Willix v. Healthfirst, Inc.*,
  2009 U.S. Dist. LEXIS 114818 (E.D.N.Y. Dec. 3, 2009) .............................. 27-28

## STATUTES, RULES AND REGULATIONS

28 U.S.C. § 1367.............................................................................................16, 17

Federal Rules of Civil Procedure
  Rule 23 ......................................................................................................... *passim*

New York Labor Law
  § 195....................................................................................................................9

## PRELIMINARY STATEMENT

Named Plaintiffs Joshua Porter, Sharkey Simmons and Emanuel Colajay Rivera (collectively, the "Named Plaintiffs") and the individuals who have joined this action by filing a consent to become a party form (the "Opt-in Plaintiffs" and, collectively with the Named Plaintiffs, the "Plaintiffs") performed a wide range of construction duties for Defendant John Moore, Gary Moore, Martin Moore (the "Individual Defendants"), Mooregroup Corporation ("Mooregroup" and, collectively with the Individual Defendants, the "Mooregroup Defendants") and Baldwin Harbor Contracting, Inc. ("Baldwin Harbor" and, collectively with the Mooregroup Defendants, "Defendants").  Defendants engaged in consistent, ongoing timekeeping, scheduling and payroll practices that resulted in systematic violations of federal and state wage and hour laws, including unpaid overtime, failure to provide wage notices, and failure to provide wage statements.[1] Throughout the relevant time period, Defendants have paid all fire guards, welders, carpenters, laborers and other construction workers in the same manner: failing to pay overtime premiums for hours worked in excess of forty (40) hours per week, frequently failing to pay for certain hours worked, and failing to provide wage notices and wage statements as required by the New York Labor Law ("NYLL").  As numerous other courts have recognized, wage claims such as these are perfectly suited for classwide treatment. *E.g., Ramos v. SimplexGrinnell LP*, 796 F. Supp. 2d 346, 359 (E.D.N.Y. June 21, 2011).

Accordingly, Plaintiffs respectfully submit this memorandum of law in support of their motion for an order certifying their NYLL claims (Counts III-V) on behalf of the following class: all fire guards, welders, carpenters, laborers and other construction employees who worked for the

---

[1] Plaintiffs also allege that Defendants engaged in retaliation against two of the Named Plaintiffs for their participation in this Action. (*Infra* at 3).

1

Mooregroup Defendants at any time since December 20, 2011 (the "Class Members").

Plaintiffs also respectfully request that the Named Plaintiffs be appointed representatives for the Class and their counsel, Pelton Graham LLC, be appointed as class counsel under Rule 23(g), and that the Court authorize Plaintiffs to send notice to putative Class Members.[2]

For the reasons set forth below, Plaintiffs' motion should be granted in its entirety.

## STATEMENT OF THE CASE

### I.   Course of Proceedings

This Fair Labor Standards Act (FLSA) collective action and NYLL class action was commenced with the filing of the Complaint on December 20, 2017 (the "Complaint") by Plaintiffs Porter and Simmons. (Dkt. No. 1). Defendants Gary Moore ("G. Moore"), John Moore ("J. Moore"), Martin Moore ("M. Moore") and Mooregroup Corporation ("Mooregroup") filed an Answer to the Complaint on February 23, 2018. (Dkt. No. 14).

Pursuant to the parties' stipulated motion (Dkt. Nos. 17, 18, 19, 20), the Court certified Plaintiffs' FLSA unpaid overtime claims as a collective action and authorized notice to be issued to all current and former fire guards, welders, laborers and other construction employees who worked for Defendants Mooregroup, J. Moore, G. Moore and/or M. Moore at any time between December 20, 2014 and May 14, 2018. (Dkt. No. 21). Defendants provided a list of one hundred and thirteen (113) employees who met this definition. (Pelton Decl. ¶ 11). Although approximately fifty percent (50%) of the notices were returned as undeliverable (Pelton Decl. ¶ 12), eight (8) collective action members exercised their right to join the action by filing consent to become party plaintiff forms with the Court, including Named Plaintiff Colajay. (Dkt. Nos. 23-25, 27, 70, 77-

---

[2] If Plaintiffs' Motion is granted, Plaintiffs propose to confer with Defendants on the form of Class Notice and production of Class Member contact information and submit a Proposed Notice to the Court.

79).[3]

On October 11, 2018, Plaintiffs informed the Court that they intended to amend the complaint to add Baldwin Harbor Contracting, Inc. as a Defendant and Plaintiff Colajay as a Named Plaintiff. (*See* Minute Entry dated Oct. 15, 2018; Dkt. No. 31). On November 29, 2018, Plaintiffs notified the Court that Plaintiff Colajay and Named Plaintiff Simmons had both experienced a disturbing incident involving an individual who identified himself as an Internal Revenue Service ("IRS") agent and urged Plaintiffs to withdraw this lawsuit and that accordingly Plaintiffs intended to add retaliation claims to their anticipated amended complaint. (Dkt. No. 34). On December 7, 2018, Defendants moved to stay the case while they retained new counsel. (Dkt. No. 35). On February 5, 2019, Defendants' current counsel appeared and filed a motion to substitute. (Dkt. Nos. 40, 42-45). Plaintiffs moved to amend the complaint on March 29, 2019 to add Defendant Baldwin Harbor, Plaintiff Colajay, and the retaliation claims. (Dkt. Nos. 47-49, 52-53). The Court granted Plaintiffs' motion to amend (Dks. Nos. 47-49, 52-53) on January 2, 2020. (Dkt. No. 62). Plaintiffs filed the operative Amended Complaint (Dkt. No. 63) on January 13, 2020.

The parties exchanged document discovery. Plaintiffs produced all the relevant documents in their possession, including copies of checks for the payment of wages, screenshots of telephone communications with Defendant J. Moore, employment documents, an "Incident Information Slip" from the New York City Police Department, communications with the IRS and safety certification cards. At Defendants' request, Plaintiffs provided releases for employment documents from other employers and an unrelated lawsuit filed by Named Plaintiff Simmons. Defendants

---

[3] The parties stipulated to dismiss the claims of Hector Martinez after Mr. Martinez confirmed dates of employment that preceded the NYLL limitations period. (Dkt. No. 82). The Court granted Plaintiffs' Motion to file the Consent Form of Oscar Vigil following a hearing held on July 1, 2020. (*See* Order of the Court dated July 1, 2020).

produced scans of checks provided to the three (3) Named Plaintiffs, check registers of payments to the three (3) Named Plaintiffs, heavily-redacted spreadsheets purporting to show hours worked by the Named Plaintiffs and other information, a corporate stock certificate showing Defendant M. Moore's ownership of Mooregroup stock, documents pertaining to an unrelated lawsuit filed by Named Plaintiff Simmons, and a payroll spreadsheet as to Plaintiff Colajay that shows internally inconsistent information as to hours worked and rates paid.  The parties deposed nine (9) Named and Opt-in Plaintiffs and the Individual Defendants.

## II.   **Relevant Facts**

### A.   **Defendants' Construction Business**

During the relevant time period, the Individual Defendants have owned, operated and managed Mooregroup, which provides construction contracting services. Currently, Mooregroup primarily performs exterior superstructure work, such as excavation, foundation and concrete work. (Pelton Decl. Ex. 1 (John Moore Deposition Transcript) 20:20-21, 22:7-8). Mooregroup also performs some interior and finish construction, such as plastering and bricklaying, which constituted a larger portion of its business in previous years. (J. Moore Depo.  20:22-22:3). Mooregroup typically operates between one and three (1-3) job sites at any given time, plus contracts open on additional sites. (J. Moore Depo. 70:25-71:21). In total, Mooregroup employs at least ten to twenty (10-20) workers on a given job site, sometimes significantly more, such that Mooregroup typically employs in excess of forty (40) workers at any given time. (Ex. 4 (Emanuel Colajay Rivera Deposition Transcript) 100:6-15; Ex. 5 (Henry Martinez Deposition Transcript) 77:22-80:22, 82:13-84:25, 85:12-87:15; Ex. 6 (Elvis Paz Deposition Transcript)  50:8-15, 59:15-22; Ex. 7 (Sharkey Simmons Deposition Transcript) 262:9-25, 328:19-329:21, 346:4-16; Ex. 9 (Jaime Rogel Deposition Transcript) 69:5-16; Ex. 10 (Juan Pablo Guaman Deposition Transcript)

40:24-8, 50:14-22, 125:10-13; Ex. 11 (Oscar Vigil Deposition Transcript) 112:17-114:15; Ex. 12 (Ricardo Trejo Deposition Transcript) 92:10-14; *see also* J. Moore Depo. 103:11-18). J. Moore affirmed that the 216(b) collective list provided to Plaintiffs was compiled by an administrative employee from a list of all Mooregroup workers at job sites[4] and all paychecks issued and that, during the past six (6) years, Mooregroup has employed in excess of forty (40) laborers and carpenters. (J. Moore Depo. 89:3-6, 123:6-125:17).  Mooregroup employees have also performed work on John Moore's private home. (J. Moore Depo 45:23-46:2; Colajay Depo. 24:2-25:2, 92:2-25; Martinez Depo. 53:22-54:13, 89:25-90:14; Paz Depo. 71:6-20, 73:8-74:10).  Mooregroup has exceeded $500,000 in revenues in each of the past four (4) years. (J. Moore Depo. 87:25-88:4).

Defendant Baldwin Harbor operates from, or uses for business purposes, the same address as the Mooregroup office (Ex. 2 (Martin Moore Deposition Transcript) 78:13-79:17; Ex. 13 at 1-2). According to J. Moore, Baldwin Harbor performs masonry and concrete work and has provided such construction services for Mooregroup and paid wages for Mooregroup employees. (J. Moore Depo. 23:4-10, 128:6-9; Ex. 13).

Defendants J. Moore and M. Moore both had construction experience prior to founding Mooregroup. (M. Moore Depo. 14:2-10). Defendant J. Moore opened his own construction company in 1986 and subsequently formed New York Contracting and Construction Corporation ("NYCC Corp."), which performed carpentry and masonry work. (J. Moore Depo 13:3-14:14).  In or around 2012, Defendants M. Moore and J. Moore opened Mooregroup around the same time that J. Moore closed down NYCC Corp. (J. Moore Depo 14:25-15:25; M. Moore Depo 13:20-25).

M. Moore is the sole owner of Mooregroup (M. Moore Depo. 5:13-20; J. Moore 175:20-

---

[4] However, as previously noted by Plaintiffs, four (4) of the Opt-in Plaintiffs did not appear on the 216(b) collective list. (Dkt. Nos. 70, 80).

23 (M. Moore "incorporated" Mooregroup)), Chief Executive Officer (Ex. 14), President and Secretary of Mooregroup (J. Moore Depo. 16:21-17:10) and appears to own all shares of stock for the company. (Ex. 15; M. Moore Depo. 71:9-72:14). Defendant J. Moore is the Vice President and manages many of the day-to-day operations. (M. Moore Depo. 25:2-4, 39:24-40:6; J. Moore Depo. 18:4-10; *see also* Ex. 3 (Gary Moore Deposition Transcript) 11:21-12:2). In addition, M. Moore's signature seems to appear on at least two (2) paychecks. (Ex. 16). Several Plaintiffs attest that G. Moore likewise possessed and exercised significant authority and control over Mooregroup job sites and employees. Specifically, Plaintiffs testified that G. Moore disciplined and terminated employees (Colajay Depo. 71:3-11, 130:25-131:13, 167:9-24; Ex. 8 (Joshua Porter Deposition Transcript) 96:3-10, 98:2-13; Vigil Depo. 29:19-30:4, 32:9-21, 148:18-149:8, 153:13-16), transported Mooregroup workers to and from a Staten Island job site (Martinez Depo. 91:15-92:6), supervised job sites (Colajay 130:25-131:14; Martinez Depo. 83:12-84:4, 85:2-6; Paz Depo. 108:8-13; Simmons Depo. 216:20-217:11; Rogel Depo. 59:4-60:2; Vigil Depo. 57:17-58:7; Trejo Depo. 25:6-22), directed foremen (Colajay Depo. 130:25-131:14, 132:3-14; Simmons Depo. 337:22-38:11; Guaman Depo. 36:17-23), ordered supplies needed by workers (Simmons Depo. 338:17-22), approved new hires (Vigil Depo. 40:12-41:19, 46:25-47:6), provided blueprints and approved changes from blueprint plans (Vigil Depo. 49:14-18, 52:2-53:4), set pay rates and had discussions with employees about pay and timekeeping issues. (Simmons Depo. 193:6-14, 338:23-25; Rogel 49:5-50:15, 56:9-57:15, Vigil Depo. 42:17-23, 45:4-17, 50:15-51:16, 110:24-112:7).

Mooregroup's construction employees include working foreman and supervisors, carpenters, laborers, machine operators, fire guards, and welders. (J. Moore Depo. 41:4-44:12 (adding that Mooregroup "seldom" contracts with independent contractors), 85:2-12 (considered fire guards in the same category as laborers and carpenters)). In addition to construction workers,

Mooregroup typically employs one (1) or two (2) administrative staff, interns and/or students working for Mooregroup for the summer, a human resources/compliance employee, and two (2) estimators. (J. Moore Depo. 35:7-40:6). Estimators calculate the costs of a job by calculating hours required to perform the labor, costs of paying workers to perform the work, and the costs of expenses such as concrete and equipment by referring to information from past job sites and employee rates provided by J. Moore. (J. Moore Depo. 157:15-159:22).

**B.      Plaintiffs' Construction Work for Mooregroup**

Throughout the relevant time period, Plaintiffs performed a wide range of construction duties for Mooregroup, including sheetrock work, working on forms and frames, pouring cement, insulation work, painting, iron work, supervising machinery, digging and excavation, carpentry, roofing, fire guard/fire safety duties, cleaning and removing debris, carrying and moving materials and equipment around the job site, welding and torch operation, supervising and sometimes operating machinery. (Colajay Depo. 15:21-16:4, 17:19-18:16, 27:12-23, 30:11-31:12, 37:19-38:17, 44:10-21, 45:2-46:5, 48:2-25; Porter Depo. 61:4-25 (started as laborer, then obtained certification to work as fire guard), 70:4-17, 73:24-76:25, 78:4-79:24; 90:6-15 (if there was no fire guard work, Porter performed laborer work), 125:21-25 ("I was a construction worker. I had many hats…"), 171:4-10 (Porter was hired as a laborer and told what steps he needed to take to be certified as a fire guard); Martinez Depo. 26:3-9, 31:13-25, 35:2-20, 39:18-40:16, 41:1-7, 43:13-20, 50:13-17, 51:12-15, 65:7-24; Paz Depo. 12:9-25, 38:17-39:12, 46:25-47:9, 59:4-14, 68:18-25; Simmons Depo. 18:5-9, 86:18-25 (after several months, was told he needed to obtain a welding certification), 87:5-7 (initially hired as a fire guard), 90:11-25, 96:21-97:12, 100:7-10, 116:17-23, 127:5-17 (performed laborer, rebar duties in addition to fire guard and welding), 154:4-15 (performed cement, flagging, rebar, laborer work); Rogel Depo. 15:7-22, 25:23-25, 38:17-39:7;

Guaman Depo. 15:5-16:17, 20:10-25, 37:21-38:9; Vigil Depo. 19:11-20; Trejo Depo. 16:20-25, 35:3-7). Plaintiffs were told by foreman where to report on a given day. (Colajay Depo. 32:19-33:8; Porter Depo. 102:5-104:11; Rogel Depo. 45:16-46:5). Plaintiffs were required to purchase their own hand tools, uniforms, and safety equipment such as helmets. (Colajay Depo. 48:2-22, 59:18-28, 60:2-17, 61:7-9, 125:15-20; Martinez Depo. 65:16-24; Simmons Depo. 133:8-134:8 (listing required personal protective equipment and tools, Mooregroup only provided a few pieces of equipment); Guaman Depo. 55:6-23, 59:10-17; Vigil Depo. 78:16-80:21 (listing tools and protective equipment he purchased); Trejo Depo. 45:21-46:9, 50:24-51:15).

### C.     Defendants' Timekeeping, Recordkeeping, and Wage Notification Practices

#### 1.     Mooregroup's Timekeeping and Recordkeeping Practices

Throughout the relevant time period, Mooregroup has not engaged a payroll service but instead calculates employees' hours worked and wages owed and pays employees "in house." (J. Moore Depo. 31:9-14). J. Moore primarily performs these functions himself, with an accountant, using Quickbooks to record accounts receivable and payable, including payroll. (J. Moore Depo. 67:7-68:13).   For "a couple years" at the beginning of Mooregroup's existence, J. Moore personally performed payroll operations. (J. Moore Depo. 35:7-13). During this time, he would record the hours worked on sheets of paper, showing each job site, employee's name, hours worked, and any requested reimbursements. (J. Moore Depo. 62:23-66:11). Since that time, he delegates some of these duties to temporary administrative staff, interns, and summer students working for the business. (J. Moore Depo 35:14-36:11). Specifically, the administrative staff member or intern would communicate with the foreman of each job site, receive reports of hours worked, and write up the paychecks, which J. Moore would then sign, typically on Thursday afternoons or Friday mornings. (J. Moore Depo. 36:3-11, 58:16-59:14, 62:23-64:14, 70:9-16,

94:19-95:2, 120:22-121:25). Currently, Mooregroup employs one (1) administrative employee, as well as a part-time intern. (J. Moore Depo. 36:13-16, 37:24-38:8). This staffing level is typical for Mooregroup. (J. Moore Depo. 39:39:16-40:6).

Mooregroup has utilized various methods for tracking employees' hours worked. Sometimes employees track their hours on a thumb scanner time clock, but these devices function inconsistently due to power supply and wi-fi issues. (J. Moore Depo 52:7-54:3; Porter Depo. 101:16-20, 158:12-159:13; Simmons Depo. 179:22-180:13; Rogel Depo. 48:11-21; Vigil Depo. 142:22-143:13). Foremen sometimes track workers' hours on a sheet of paper, either a timesheet provided by Mooregroup or their own paper, or have employees sign in on a sign-in sheet. (J. Moore Depo 54:4-9, 115:17-16:9, 119:21-120:25; Porter Depo. 71:18-25, 101:11-16, 145:17-23; Paz Depo. 22:13-23:2 (at one site, signed in at security desk, which was not operated by Mooregroup), 63:22-64:10 (signed in about 2 times per week, otherwise supervisor would track hours), 109:8-20 (no formal timekeeping system, hours were frequently rounded); Rogel Depo. 43:8-18; Guaman Depo. 67:21-68:4; Vigil 28:4-18; Trejo 52:17-20). Plaintiffs often did not track their own hours. (Colajay 67:20-68:5, 80:15-24, 98:13-25; Martinez Depo. 101:23-103:5; Paz Depo. 50:16-25; Simmons 167:2-7, 170:3-11, 172:7-173:19). The time sheets kept by Defendant J. Moore and other Mooregroup employees are typically filed in the Mooregroup office and are not scanned into a computer. (J. Moore Depo. 62:23-66:3, 72:20-73:8, 121:3-122:3). Mooregroup does not have a list of all employees' hourly rates; J. Moore has all employee rates memorized. (J. Moore Depo. 158:9-161:4).

### 2. Defendants Failed to Provide Wage Statements and Wage Notices

Mooregroup does not provide wage statements or wage notices to construction workers setting forth the information required by NYLL §§ 195(1)(a), (3). (J. Moore Depo. 60:19-62:5;

Paz Depo. 110:20-24; Simmons Depo. 192:5-19 (asked J. Moore for a paystub when he received his first paycheck, was told "this is how we do it" and never received the paystub), 335:8-336:14; Rogel Depo. 89:11-90:2; Guaman Depo. 140:8-15, 144:19-25; Vigil Depo. 147:20-148:9; Trejo Depo. 108:2-109:2). After speaking with a worker at hiring, J. Moore would decide each worker's pay rate, and either he or a foremen would verbally notify workers of their rate. (J. Moore Depo. 90:20-91:11; Colajay 106:9-12). Defendant J. Moore testified that, in his opinion, Mooregroup construction workers do not need to know their wage rates because "most of them are just very happy to be employed." (J. Moore Depo. 60:10-17). J. Moore testified that workers can ask their foreman about their hourly rate and the hours for which they are paid and can request documents showing their rate, but that these materials are not given to workers in the regular course of business. (J. Moore Depo. 60:19-62:5, 73:16-19 (workers could get a print-out of tax withholdings upon request), 107:11-20).

Defendant J. Moore asserted that some pay information was included in a "paperwork package" at hiring that requested workers' information for payroll processing, specifically a document stating that any hours worked over forty (40) were paid time and a half. (J. Moore Depo. 90:20-94:18) A similar notice was posted at job sites. (J. Moore Depo 93:21-23). None of the notices provided by Mooregroup were signed by workers. (J. Moore Depo. 93:6-94:16). Paychecks were handwritten and "sometimes" showed hours worked, depending upon the administrator who wrote them. (J. Moore Depo. 93:21-94:18; Colajay 106:21-107:15 (figured out the hours he was paid for by dividing his weekly total by his hourly rate); Paz Depo. 110:7-19 (paid by payroll check that did not show hours worked or taxes withheld); Rogel Depo. 56:3-4 (paid by personal check); Vigil Depo. 89:21-23 (same); Trejo Depo. 108:2-7 (same)).

J. Moore confirmed that all wage notification documents have been produced to Plaintiffs.

10

(J. Moore Depo. 92:7-10). However, Mooregroup has not produced the contemporaneous time sheets kept by J. Moore or the foreman. (*Supra* at 8, 9; Pelton Decl. ¶ 17). J. Moore confirmed that the spreadsheets produced to Plaintiffs (Ex. 17) were not kept in the ordinary course of business and instead were created for this litigation by an administrative employee reviewing handwritten records. (J. Moore Depo. 108:17-110:20 (discussing Ex. 17 at 1 (Pls.' Depo. Ex. 4)), 111:3-112:2 (discussing Ex. 17 at 2-8 (Pls.' Depo. Ex. 13)), 142:11-144:9 (discussing Ex. 17 at 9-11 (Pls.' Depo. Ex. 19)); 155:20-157:14 (discussing Ex. 17 at 12-18 (Pls.' Depo. Ex. 22) and at 19-23 (Pls.' Depo. Ex. 23)). Although Mooregroup still has the underlying records (J. Moore Depo. 148:21-25), they have not been provided to Plaintiffs. (Pelton Decl. ¶ 17).

### D.   Defendants' Unlawful and Ongoing Classwide Pay Practices

#### 1.   Plaintiffs and the Putative Class Typically Worked Well Beyond Forty Hours Per Week

Plaintiffs and the putative Class Members typically worked well in excess of forty (40) hours per week. (Porter Depo. 217:25-218:4, 287:11-25 (worked between 50-58 hours per week); Martinez Depo. 98:13-23 (typically worked more than 50 hours per week)). Plaintiffs worked five (5) and often six (6) days per week, which sometimes included weekend work at Defendant J. Moore's house. (Colajay Depo. 62:7-12, 63:8-10, 76:18-25, 90:18-91:17, 121:18-122:10; Porter Depo. 114:22-115:5, 133:16-25; 266:2-9; Martinez Depo. 95:13-24, 98:7-9; Paz Depo. 13:24-14:2, 68:18-10 (sometimes worked Sundays as well as Saturdays), 81:9-19, 109:2-9; Simmons Depo. 147:15-20, 160:20-22, 336:15-17; Rogel Depo. 19:3-21:11; Guaman Depo. 29:9-15, 63:13-24; Vigil Depo. 34:10-19; Trejo Depo. 51:25-52:7).

On weekdays, Mooregroup employees typically started working around 7:00 am, although some jobs started earlier, and worked until at least 3:30 pm and sometimes several hours later, depending on the job and the specific duties to be performed. (Colajay Depo. 61:19-62:2, 63:8-21,

65:18-21, 75:6-76:10, 81:10-12, 82:4-16, 95:10-16, 97:5-17, 121:5-11; Porter Depo. 134:7-24 (typically worked about ten (10) hours per day), 141:22-142:18, 144:10-12, 182:13-22 (schedule was similar at all job sites), 215:25-216:9; Martinez Depo. 90:22-91:5 (schedule was similar at all jobs, start time was typically set but end time fluctuated), 95:8-24, 98:2-12, 107:5-17, 110:3-19; Paz Depo. 16:11-21, 20:14-22:9 (arrived at job sites before 7:00 am to get tools from a tool room), 30:12-16, 43:7-44:4, 65:23-25; Simmons Depo. 95:4-18, 150:15-151:4, 153:10-154:3, 156:25-157:3, 158:6-12, 336:25-337:3; Rogel Depo. 19:3-21:25, 29:7-13, 43:5-44:8, 54:7-16; Guaman Depo. 29:5-25, 31:3-12, 62:14-63:8, 64:14-17, 142:13-22; Vigil Depo. 26:9-23, 33:21-34:9, 45:24-46:8, 81:6-82:4, 89:17-18, 146:4-6; Trejo Depo. 24:13-17, 35:17-36:37:12, 51:20-24). At some jobs, Plaintiffs were required to arrive at or before 6:00 am at a meeting point for transportation to a job site. (Martinez Depo. 91:13-95:7; Paz Depo. 60:18-62:16 (not permitted to work if did not take the van)). On weekends, Plaintiffs sometimes worked fewer hours than their full weekday schedules. (Porter Depo. 150:11-151:22, 153:16-155:14; Simmons Depo. 158:13-24; Rogel Depo. 21:12-18; Guaman Depo. 29:13-15; Vigil Depo. 35:17-36:13, 51:25-52:5).

Typically, all Mooregroup employees on a job site worked a similar number of hours. (Colajay 85:2-9; Martinez 116:16-23; Simmons Depo. 188:22-189:3, 259:5-20 (Mooregroup employees started between 6:45 and 7:00 am and no one left before 3:30 pm); Rogel Depo. 36:13-21; Guaman Depo. 43:7-44:25 (everyone at job site worked until at least 5:30 pm and Mooregroup laborers stayed at the site same number of hours); Vigil Depo. 61:3-22, 74:5-75:8, 114:24-115:24, 116:25-117:9, 119:3-120:7, 152:10-12; Trejo Depo. 36:16-37:25 (carpenters, rebar workers, laborers often stayed as late as cement workers)).

### 2. Mooregroup's Wage Payment Practices Are Common and Consistent for All Plaintiffs and Putative Class Members

As described by Defendants, Mooregroup's scheduling, timekeeping and payroll practices

are consistent for all fire guards, welders, carpenters, laborers and other construction employees. (J. Moore Depo. 54:10-58:15 (describing schedules of construction workers, laborers, carpenters), 89:3-90:19 (confirming that all laborers and carpenters are paid in the same manner); *see also* Vigil 60:7-22 (Mooregroup's fire guards were paid at the same time as all other employees)). Mooregroup paid construction workers at hourly rates that ranged from approximately thirteen dollars ($13.00) to forty dollars ($40.00), depending on position, skill and experience (J. Moore Depo 59:15-60:9; Colajay 95:20-97:2; Porter Depo. 74:16-21, 136:11-13; Martinez Depo. 56:6-25; Paz Depo. 33:10-24, 68:4-10; 80:10-18, 106:12-107; Simmons Depo. 175:10-20; Rogel Depo. 28:11-16; Guaman Depo. 30:23-31:2; Vigil Depo. 42:17-21, 63:10-11; Trejo Depo. 23:2-24).

During the relevant time period, Mooregroup employees were paid primarily by checks from Mooregroup and sometimes by checks from Baldwin Harbor. (Colajay Depo 135:22-12; Porter Depo. 95:2-5 (all checks from Mooregroup even when he was assigned to work at different sites, as these assignments came through Mooregroup), 240:18-23; Martinez Depo. 139:6-23; Paz Depo. 110:7-19; Guaman Depo. 117:22-118:15, 119:12-121:12 (paid by Baldwin Harbor on at least one occasion for work for Mooregroup); Rogel Depo. 56:3-4; Vigil Depo. 89:21-23, 120:4-122:8 (sometimes paid by Baldwin Harbor checks, was told that the checks from Baldwin Harbor were coming from Mooregroup), 125:9-12; Trejo Depo. 82:13-23, 108:2-7, 109:3-25; Exs. 13, 16, 18). Plaintiffs at all times understood themselves to be employees of Mooregroup. (Porter Depo. 152:7-8, 172:23-174:3 (in order to receive his fire guard certification, needed a letter from Mooregroup confirming that he was a Mooregroup employee), 241:18-24 (sometimes assigned to work as a fire guard for another contractor but always paid by Mooregroup); Guaman Depo. 123:15-21, 145:13-17; Vigil Depo. 26:5-8, 121:28-122:19; Trejo Depo. 110:2-23).

### 3.   Mooregroup Routinely Engaged in Overtime Violations by Failing to Pay Overtime Premiums and Failing to Pay for All Hours Worked

Despite working well in excess of forty (40) hours most weeks, Plaintiffs did not receive overtime premiums consisting of one and one-half (1.5) times their hourly rate for hours worked beyond forty (40) per week. (Colajay 81:18-25, 166:2-22; Porter Depo. 271:18-273:6, 277:19-25; Martinez Depo. 9:11-16; Paz Depo. 80:24-81:8 (received overtime on one (1) occasion for work on a Sunday), 91:2-6, 109:2-9; Simmons Depo. 294:12-17, 330:12-18 (when Simmons complained to J. Moore about not receiving overtime, was told he could "go kick rocks"), 342:12-343:9; Rogel Depo. 72:9-18, 74:5-25, 86:12-87:8; Guaman Depo. 113:23-114:25, 115:15-19 (was told by coworkers that Mooregroup did not pay overtime), 138:12-139:11; Vigil Depo. 38:17-18, 137:6-18, 143:24-144:13, 146:7-14, 147:4-19; Trejo Depo. 41:25-42:6, 101:9-16, 106:23-107:9). In addition, Plaintiffs frequently found that they were missing hours from their weekly pay, such that they were paid for fewer hours than they actually worked. (Colajay 79:22-80:7, 82:2-83:12, 84:3-14, 108:19-25, 109:2-12, 111:3-9, 118:17-21, 122:11-123:9; Porter Depo. 186:19-23, 189:2-8; 208:2-22 (was told he would not receive his final paychecks when he was terminated), 218:7-21, 267:11-268:3; Martinez Depo. 56:21-25, 116:24-117:9 (foreman told Martinez that time they spent in the tool room after finishing at a job site did not count), 123:4-127:14; Paz Depo. 89:17-90:22, 109:8-10; Simmons Depo. 174:11-175:3, 240:11-17, 260:12-25; Rogel Depo. 49:5-50:15, 58:6-17, 87:9-18; Guaman Depo. 80:14-81:21, 98:22-99:8 (would have an hour deducted if he arrived 10 minutes late), 103:25-104:7, 111:19-112:14, 141:23-12, 146:4-16; Vigil Depo. 62:24-63:2, 64:7-66:4 (complained almost weekly almost missing hours, attended meetings where Defendants stated that time was deducted from employees' pay when tools went missing), 68:8-14, 137:19-23, 146:15-147:3; Trejo Depo. 67:7-18, 73:25-75:2; 84:4-85:11, 87:3-88:3, 100:22-101:24, 107:11-25). Defendants deducted pay from workers, including Plaintiffs, when tools went missing.

(Colajay Depo. 122:18-23; Guaman Depo.110:13-23; Vigil Depo. 65:17-66:10).

Plaintiffs discovered their missing hours by dividing their total wage amount by their hourly rate, but when they complained to John Moore or foremen, were frequently dismissed or told that it was "not their problem" and directed to speak with someone else, such that they did not receive a satisfactory explanation or receive compensation, even when they were promised additional pay. (Colajay 79:15-80:9, 82:22-83:12, 84:12-25, 115:8-21; Porter Depo. 220:13-221:3, 223:7-23 (Porter went to see John Moore at a job site about pay and was threatened that he needed to "get off [John Moore's] site or [he] will be removed"); 242:2-13, 245:4-10, 248:16-25, 250:4-11; Simmons Depo. 171:2-8, 197:11-16; Guaman Depo. 105:16-106:7; Vigil Depo. 68:25-69:13; Trejo Depo. 75:3-76:16; *see also* J. Moore Depo. 87:12-24 (when employees complained about pay, J. Moore encouraged them to knuckle down and work hard)). Mooregroup employees often discussed their pay and their missing hours, both among themselves and with the foreman and J. Moore. (Colajay Depo. 109:2-115:16, 118:25-119:16, 120:8-121:4; Porter Depo. 117:10-118:8, 201:2-202:4 (was told by a foreman to keep his own record of hours worked due to Mooregroup's recurring "issues with pay"); 218:22-219:2 (complained to foremen and staff about missing hours), 275:18-276:15; Martinez Depo. 99:13-25 (co-workers commented that they "didn't know why they were always missing hours"; Paz Depo. 109:21-110:6; Guaman Depo. 107:21-109:22, 112:15-21; Vigil Depo. 66:2-67:14; Trejo Depo. 112:13-113:23). At times Plaintiffs' and Class Members' paychecks bounced, such that their wages were sometimes several weeks late and they were charged bank fees. (Colajay Depo. 123:5-14, 127:2-129:7; Porter Depo. 184:5-185:6; Martinez Depo. 9:11-16; Paz Depo. 86:16-88:3; Vigil Depo. 95:7-96:16). John Moore sometimes paid employees in cash for bounced checks. (Colajay Depo. 174:13-18).

**ARGUMENT**

I.    **THIS COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS**

Before turning to Plaintiffs' arguments in favor of certifying Plaintiffs' NYLL claims as a class action, it is first appropriate to address the Court's jurisdiction over those claims. Title 28 U.S.C. § 1367 allows a district court to exercise supplemental jurisdiction over a state law claim where the claim is "so related [to the federal claims] that they form part of the same case or controversy." 28 U.S.C. § 1367(a).  Claims "form part of the same case or controversy" if they "derive from a common nucleus of operative fact," *Shahriar v. Smith & Wollensky Restaurant Group, Inc.,* 659 F.3d 234, 245 (2d Cir. 2011), and "would ordinarily be tried in one judicial proceeding." *MMT Sales, Inc. v. Channel 53 Inc.,* No. 92-cv-7207, 1993 U.S. Dist. LEXIS 18208, at *4 (S.D.N.Y. Dec. 27, 1993) (*quoting Promisel v. First American Artificial Flowers Inc.,* 943 F.2d 251, 254 (2d Cir. 1991)). District courts generally exercise discretion in favor of supplemental jurisdiction where "considerations of judicial economy, convenience and fairness to litigants" weigh in favor of hearing the state law claims at the same time as the federal law claims. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966).

Here, Plaintiffs' NYLL unpaid overtime claim challenges the same policy and practice as their federal FLSA claim – Defendants' practice of failing to pay overtime premiums for all hours worked in excess of forty (40) in a given workweek. These claims are identical in every respect except the applicable statute of limitations; they clearly form part of the same case or controversy. Plaintiffs' FLSA and NYLL retaliation claims brought on behalf of Plaintiffs Simmons and Colajay are likewise essentially identical. Plaintiffs' failure to provide wage statements and failure to provide wage notices, while not identical to the FLSA claims, nevertheless arise out of the same common nucleus of operative facts – *i.e.,* Defendants' pay practices with respect to their employees

16

– and involve the same pay policy evidence such that those claims would ordinarily be tried in the same judicial proceeding as the overtime claims. Accordingly, all of Plaintiffs' state law claims form part of the "same case or controversy" as Plaintiffs' federal claim making the exercise of supplemental jurisdiction appropriate.

Moreover, none of the exceptions to the exercise of supplemental jurisdiction set forth in § 1367(c) apply. Plaintiffs' state law claims do not raise a "novel or complex issue of [s]tate law." *Shahriar,* 659 F.3d at 246 (holding that NYLL provisions regarding tip sharing and spread of hours claims do not raise novel or complex issues). The same pay records and evidence that are relevant to the unpaid overtime claims will be relevant to the wage-statement and wage-notice claims. It is for these same reasons that the Plaintiffs' NYLL claims do not "substantially predominate" over their FLSA claims under § 1367(c)(2). *Id.,* 659 F.3d at 246-47. As for the other exceptions to exercising supplemental jurisdiction, section 1367(c)(3) is not applicable here because the Court has not dismissed any claims over which it has original jurisdiction, and this case presents no "exceptional circumstances" or "compelling reasons" for the Court to decline jurisdiction under section 1367(c)(4). *Id.,* 659 F.3d at 247-50.

Considerations of judicial economy, convenience and fairness to litigants counsel in favor of trying both claims that turn on the legality of Defendants' challenged compensation policies, FLSA and NYLL, in one action. In these circumstances, exercise of supplemental jurisdiction over the NYLL claims is appropriate, as courts in New York have routinely recognized. *Shahriar*, 659 F.3d at 245 (approving widespread practice in FLSA claims of exercising supplemental jurisdiction over related NYLL claims); *Ramirez v. HJS Carwash, Inc.,* No. 11-cv-2664, 2013 U.S. Dist. LEXIS 51344 (E.D.N.Y. April 9, 2013) (in FLSA action exercising supplemental jurisdiction over NY minimum wage, overtime and spread of hours claims).

## II.   THIS COURT SHOULD CERTIFY PLAINTIFFS' NYLL CLAIMS AS A RULE 23(b)(3) CLASS ACTION

A party seeking class certification has the burden of demonstrating that Rule 23's requirements are satisfied. *Caridad v. Metro-North Commuter Railroad,* 191 F.3d 283, 291 (2d Cir. 1999). However, Rule 23 should be given a "liberal rather than restrictive construction," and "the Second Circuit's general preference is for granting rather than denying class certification." *Lin v. Benihana N.Y. Corp.*, No. 10-cv-1335, 2012 U.S. Dist. LEXIS 186526, at *11 (S.D.N.Y. Oct. 23, 2012). Any "doubts about whether Rule 23 has been satisfied should be resolved in favor of certification." *Meyers v. Crouse Health Sys.*, 274 F.R.D.404, 412 (N.D.N.Y. 2011).

When considering a motion for class certification, the court must accept the allegations in the complaint as true. *See*, *e.g.*, *Meyer v. United States Tennis Ass'n*, 297 F.R.D. 75, 82 (S.D.N.Y. 2013). The Court may also "consider material outside the pleadings in determining whether to certify a class," but it "must not consider or resolve the merits of the claims of the purported class." *Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 85 (S.D.N.Y. 2011). On a Rule 23 motion, "the ultimate question is not whether the plaintiffs… will prevail on the merits but rather whether they have met the requirements of Rule 23." *Gortat v. Capala Bros.*, 257 F.R.D. 353, 362 (E.D.N.Y. 2009).

"Courts in this Circuit have displayed 'a preference for granting rather than denying class certification.'" *Morris v. Alle Processing Corp.*, No. 08-cv-4874, 2013 U.S. Dist. LEXIS 64534, at *5 (E.D.N.Y. 2013) (quoting *Gortat*, 257 F.R.D. at 361); *see Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997). Moreover, courts in this Circuit "routinely certify class action[s] in FLSA matters so that New York State and federal wage and hour claims are considered together." *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 163 (S.D.N.Y. 2008) (collecting cases). *See also Mendez v. Radec Corp.*, 260 F.R.D. 38, 54 (W.D.N.Y. 2009) ("My conclusion that class

18

certification is proper [for plaintiffs seeking lost wages] is in accord with many other decisions from within this circuit." (collecting Second Circuit cases).

Plaintiffs seek to certify their all NYLL claims – *i.e.*, failure to pay overtime premiums and to provide accurate wage statements and wage notices – for all Class Members. As demonstrated by the facts above and as set forth below, the Class easily satisfies the requirements of Rule 23(a) and (b)(3).

### A.     Rule 23(a)(1): Numerosity

A class must be "so numerous that joinder of all members is impracticable." F.R.C.P. 23(a)(1). In the Second Circuit, "numerosity is presumed at… 40 members." *Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995), but the precise number of class members need not be established. *See Lewis v. Alert Ambulette Serv. Corp.*, No. 11-cv-442, 2012 U.S. Dist. LEXIS 6269, at *23 (E.D.N.Y. Jan. 19, 2012). "Determination of practicability depends on all the circumstances surrounding a case, not on mere numbers." *In Re Beacon Assocs. Litig.*, 282 F.R.D. 315, 326 (S.D.N.Y. 2012). "Relevant considerations include judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." *Id.*

Defendant J. Moore and Plaintiffs have affirmed that forty (40) or more construction employees worked for Mooregroup at any given time throughout the NYLL limitations period. (*Supra* at 4-5). This information is confirmed by the 216(b) collective list provided by Defendants, which shows in excess of one hundred (100) employees who met the 216(b) collective definition. Even if a handful of these names consist of managers, such as the Individual Defendants, and administrative staff, all of the available evidence confirms that over the span of the NYLL

19

limitations period, the total number of construction workers employed by Mooregroup easily surpassed the forty (40) class member threshold for establishing numerosity.  As such, numerosity is satisfied. *See, e.g., Poplawski v. Metroplex on the Atlantic, LLC*, No. 11-cv-3765, 2012 U.S. Dist. LEXIS 46408, at *15 (E.D.N.Y. April 2, 2012) ("Precise quantification of class members is not necessary, so long as plaintiffs reasonably estimate the number to be substantial.") (citing *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993)).

### B.     Rule 23(a)(2): Common Questions

To merit class certification, claims must "depend upon a common contention ... of such a nature that it is capable of class wide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011). "Commonality does not mean that all issues must be identical as to each member, but it does require that plaintiffs identify some unifying thread among the members' claims that warrant[s] class treatment." *Garcia v. Pancho Villa's of Huntington Village, Inc.,* 281 F.R.D. 100, 105 (E.D.N.Y. 2011). Even a single common question is sufficient to meet the commonality requirement. *Wal-mart Stores*, 131 S.Ct. at 2556.  Where the question of law involves "standardized conduct of the defendant... a common nucleus of operative fact is typically presented and the commonality requirement... is usually met." *Lewis*, 2012 U.S. Dist. LEXIS 6269, at *25. For this reason, "commonality is usually satisfied in wage cases 'where the plaintiffs allege that defendants had a common policy or practice of unlawful labor practices." *Chime v. Peak Sec. Plus, Inc.*, 137 F. Supp. 3d 183, 208 (E.D.N.Y. 2015).  That is precisely the case here.

Defendants' NYLL violations were common to all Class Members.  Specifically, Plaintiffs allege that Defendants failed to pay them and all construction workers at Mooregroup overtime premiums for all hours worked over forty (40) in a given week, frequently failed to pay them for several hours per week—which further lowered their effective hourly pay, and failed to provide

wage statements and wage notices.  Mooregroup construction employees frequently discussed their missing hours and lack of overtime pay among each other and complained about their pay to foremen and the Individual Defendants.

As a result, all members of the putative Class raise the same common issues which are susceptible to common answers: (1) whether Defendants had a policy of not paying overtime premiums for all hours worked in excess of forty (40) in a given workweek; (2) whether Defendants had a policy of failing to provide wage statements with payment of wages to employees; (3) whether Defendants had a policy of failing to provide wage notices at hiring, annually, and with each change in hourly rates.  There are also common legal questions susceptible to common answers regarding whether or not these common policies are illegal under the NYLL. Thus, the class more than satisfies the common question requirement. *See Shahriar*, 659 F.3d at 252 (upholding combined FLSA/NYLL class action and finding common questions satisfied where all NYLL claims derived from the same policy of defendants).

The extent of the common questions presented by the class will be addressed in more detail in the discussion of Rule 23(b)(3) "predominance" inquiry. *See Morangelli v. Chemed Corp.*, 275 F.R.D. 99, 106 (E.D.N.Y. 2011) (combining 23(a)(2) commonality and 23(b)(3) predominance requirements into one analysis); *see also Moore v. Paine Webber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

### C.      Rule 23(a)(3): Typicality

"Typicality requires that 'the claims of the class representatives be typical of those of the class, and is therefore satisfied when each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove defendants' liability.'" *Myers v. Hertz Corp.*, No. 02-cv-4235, 2007 U.S. Dist. LEXIS 53572, at *18 (E.D.N.Y. July 24, 2007)

(*quoting Marisol A.*, 126 F.3d 372, 376 (2d Cir. 1997)). However, "[t]ypicality 'does not require that the factual background of each named plaintiff's claim be identical to that of all class members; rather, it requires that the disputed issue of law or fact occupy essentially the same degree of centrality to the named plaintiff's claims as to that of other members of the proposed class.'" *Damassia*, 250 F.R.D. at 158 (quoting *Caridad*, 191 F.3d at 293).

Here, the Plaintiffs and the prospective class "were subject to the same general employment scheme," *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 204 (S.D.N.Y. 2006), and their claims are all based on "the same course of events and legal theory." *Damassia*, 250 F.R.D. at 158. The Plaintiffs performed a wide variety of construction duties, yet worked similar schedules and experienced the same unlawful pay policies. Indeed, Defendant John Moore quite clearly affirmed throughout his deposition that all Mooregroup construction workers were paid in the same way. (J. Moore Depo. 89:3-90:15; *see also supra* at 12-13).

As such, Plaintiffs' claims for unpaid overtime and failure to provide wage statements and wage notices are typical of the claims of the other class members.  If these challenged payroll practices were unlawful as to Plaintiffs, they were unlawful as to all members of the Class making Plaintiffs' claims typical of the class.

**D.      Rule 23(a)(4): Adequacy of Representation**

The modern understanding of the Rule 23(a)(4) adequacy requirement is twofold. First, the class representative must "be part of the class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents," *Cordes & Co. Financial Services, Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007), and "representatives must have no interests conflict with the class." *Lewis*, 2012 U.S. Dist. LEXIS 6269, at *30. "Only a fundamental conflict will defeat the adequacy of representation requirement." *Id.* Second, class

counsel must be "qualified, experienced and able to conduct the litigation." *Lin*, 2012 U.S. Dist. LEXIS 186526, at *24.

Here, the Plaintiffs are members of the class they seek to represent and have the same interests as the Class Members. It was typical for Mooregroup construction workers to perform a wide variety of tasks, particularly laborer tasks, even if a specific worker possessed a job title other than laborer. (*Supra* at 7-8). Plaintiffs and Class Members worked similar schedules that typically exceeded forty (40) hours per week. (*Supra* at 11-12). Plaintiffs and the Class Members experienced unlawful pay practices, specifically failure to pay overtime premiums as well as hours missing from their checks, that deprived these workers of the overtime wages required by law. Likewise, Plaintiffs and Class Members were not provided with wage notices and wage statements as required by the NYLL. There are no conflicts between Plaintiffs and the class that would preclude them from vigorously representing the Class Members. Any defenses to Plaintiffs' legal arguments for unpaid overtime and failure to provide wage statements and wage notices would be common to all Class Members because they were all paid pursuant to the same policies. As such, Plaintiffs will be able to adequately represent the interests of all Class Members in this action.

Finally, as set forth above and in the enclosed declaration of Brent E. Pelton, class counsel is experienced in handling large, multi-party actions and is fully qualified to pursue this action. Therefore, both prongs of the adequacy inquiry – qualification of the class representatives and qualification of class counsel – are easily met.

### E.      Rule 23(b)(3):  Common Questions Predominate

The requirement that common questions predominate tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). Predominance is satisfied when "resolution of some of the

legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore*, 306 F.3d at 1252; *see also In re Nassau County Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006). Class members aggrieved by a single policy of the defendant who rely on a legal theory common to all victims of that policy necessarily satisfy the predominance requirement. *See Lewis*, 2012 U.S. Dist. LEXIS 6269, at *36 (predominance satisfied where plaintiffs allege defendants' uniform policy of denying overtime and spread-of-hours); *Lin*, 2012 U.S. Dist. LEXIS 186526, at *28 (predominance satisfied for spread-of-hours and wage statement claim). That is precisely the case here.

### 1. Common Questions Predominate With Respect to Liability for Plaintiffs' Claims.

Common questions predominate with respect to Plaintiffs' claims. Plaintiffs' claims are all based on policies of Defendants that applied to all Class Members – *i.e.* that Defendants did not pay overtime premiums for hours worked in excess of forty (40) per week and failed to pay workers for all hours worked; did not provide wage statements with the payment of wages; and did not provide wage notices at any time. Defendant John Moore's testimony illuminates the commonality of Defendants' practices as to all of these items. (*Supra* at 12-13). As such, these uniform policies as to each Class will be established through generalized proof applicable to the Class as a whole, specifically testimony of Defendants as well as Plaintiffs and Class Members. Once those uniform policies are established, the only remaining issue is whether those policies violated the statutory standards established by the State of New York, a legal question common to the entire class. There are no individual questions raised with respect to liability for the NYLL claims. Common questions not only predominate but are the *only* questions presented.

Because common questions predominate in cases, like this one, that challenge the legality

24

of an employers pay practices under NYLL, courts routinely certify such actions for class treatment. *See e.g., Lewis*, 2012 U.S. Dist. LEXIS 6269 (certifying joint FLSA/NYLL Rule 23 class action for unpaid overtime, minimum wage, spread of hours and deductions claims).

### 2.   Common Questions Predominate With Respect To Damages.

Damages can easily be established through generalized proof.  Defendants have provided extremely sparse payroll records and, as affirmed by Defendant John Moore, these are not in fact contemporaneous records that were kept in the ordinary course of business but instead were created for the purposes of this litigation. (*Supra* at 11). In any event, these records are nearly impossible to decipher (Exs. 17) and, in one instance, shows mathematically impossible calculations that belies Defendants' indifferent, if not deceptive, approach to timekeeping. (Ex. 17 at 1).[5]

As such, damages will be established through testimony of Plaintiffs and Class Members regarding their hours worked and amounts paid. Plaintiffs' deposition testimony affirms that this information is largely consistent and shows the commonality of Defendants' pay practices. This fact does not defeat class certification, as "it is well-settled that individualized damages calculations do not defeat predominance." *Johnson v. Brennan*, No. 10-cv-4712, 2011 U.S. Dist. LEXIS 105775, at *18 (S.D.N.Y. Sept. 16, 2011). Indeed, a class action based on unpaid wages "will necessarily involve calculations for determining individual class member damages, and the need for such calculations do not preclude class certification." *Shabazz v. Morgan Funding Corp.*, 269 F.R.D. 245, 250-51 (S.D.N.Y. 2010). Defendants' failure to accurately track Class Members' hours worked does not hinder class certification, as "there is no indication that any [employee] would use some particular kind of evidence specific only to him or her in order to prove what

---

[5] The rates and hours set forth in this purported record do not yield the total pay amount set forth therein. However, the total pay amounts do divide much more neatly by the rate Colajay testified that he was actually paid at that time, $22 per hour, and show several weeks exceeding fifty (50) hours per week. (Colajay Depo. 96:3-24).

hours they worked" or that "these individualized damages inquiries would predominate over generalized liability issues affecting the whole class." *Lassen v. Hoyt Livery, Inc.*, No. 13-cv-1529, 2014 U.S. Dist. LEXIS 129784, at *34 (D. Conn. Sept. 17, 2014). Further, the Court is authorized to grant class status as to liability only, should the court deem that a more reasonable approach. *In re Nassau County Strip Search*, 461 F.3d at 226-27.

As damages will be calculated from common proof, specifically Defendant's records, and will require modest individual testimony, common questions predominate Plaintiffs' and Class Members' claims for damages.

### F.      Rule 23(b)(3): Superiority

Rule 23(b)(3) sets out four factors bearing on the question of superiority: (1) the extent to which the class members have an interest in individually controlling the prosecution of their claims; (2) the extent and nature of any litigation concerning the controversy already begun by class members; (3) the desirability of concentrating the litigation in one forum; and (4) the likely difficulties in managing the class action. All four of these factors favor certification of the Class.

(1) The class members have no interest in individually controlling the prosecution of their claims. In many cases, the amount of damages at issue is not large enough to make individual actions feasible, and "the costs of maintaining separate actions would be prohibitive." *Meyers*, 274 F.R.D. at 418. Pursuing individual actions may also be difficult for the class members because some of them are immigrants who may lack familiarity with the American legal system. *Ansoumana*, 201 F.R.D. at 85-86. Also, since many of the putative class members are current employees of Defendants, a determination of superiority is warranted due to the "possibility that employees would be dissuaded from pursuing individual claims by fear of reprisal." *Guzman v. VLM, Inc.*, No. 07-cv-1126, 2008 U.S. Dist. LEXIS 15821, at *25 (E.D.N.Y. Mar. 2, 2008).

(2) A search on PACER reveals no pending FLSA or NYLL claims against Defendants and Plaintiffs are aware of no such cases. As a result, litigating the common issues raised by this case on behalf of the class will achieve the judicial economy that Rule 23 was designed to promote.

(3) Given that the evidence necessary to establish liability (*i.e.*, Defendants' time and payroll records and party testimony) is the same whether this action is tried as an individual or class action, it is clearly desirable for efficiency and judicial economy to concentrate all of the claims in one forum. Class adjudication is far superior to the filing of dozens of separate actions all raising the same questions and offering the same evidence regarding the nature and legality of Defendants' pay policies. The superiority of class treatment is particularly great here because the claims of the class members all arise in the Eastern District of New York. As a result, class treatment will avoid the filing of dozens of identical claims in the same court and conversely will not result in this court adjudicating claims that could have been filed in a different jurisdiction.

(4) Courts in the Second Circuit have made clear that there are no manageability problems inherent in certifying NYLL Rule 23 class in conjunction with an FLSA collective action. *See, e.g., Shahriar*, 659 F.3d at 244; *Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 334 (S.D.N.Y. 2004). *Shahriar* is particularly instructive; the Second Circuit affirmed class certification of the combined FLSA/NYLL action, explaining that "the 'conflict' between the opt-in procedure under the FLSA and the opt-out procedure under Rule 23 is not a proper reason to decline [supplemental] jurisdiction" over an NYLL claim or to decline to certify an NYLL claim as a class action. *Id.* at 248. Class actions relying on a single state's law are well-suited to class treatment. *See Indergit v. Rite Aid Corp.*, 293 F.R.D. 632, 658 (S.D.N.Y. 2013) (no manageability concerns for approximately 300 class members in New York state).

Denying class certification on manageability grounds is "disfavored" and "should be the

exception rather than the rule." *Willix v. Healthfirst, Inc.*, 2009 U.S. Dist. LEXIS 114818, at *13 (E.D.N.Y. Dec. 3, 2009) (*quoting In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001)). Accordingly, a class action is a superior method of adjudicating this case.

## III.   PLAINTIFFS' COUNSEL SHOULD BE APPOINTED AS CLASS COUNSEL

As class counsel must fairly and adequately represent the class, in making this appointment, the Court must consider: (i) the work counsel has done in identifying or investigating potential claims in this action; (ii) counsel's experience in handling class actions and complex litigation and the claims asserted; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to the representation. Fed. R. Civ. P. 23(g)(A).

Plaintiffs' counsel, Pelton Graham LLC, meets all the relevant criteria.  Pelton Graham LLC is highly experienced in complex wage and hour litigation, and specifically litigation defending the rights of New York construction employees. (*See* Pelton Decl. ¶¶ 2-5). Additionally, Plaintiffs' counsel is willing and able to commit the necessary resources to represent the Class, and has already done substantial work identifying, investigating, and litigating Plaintiffs' claims. (*See id*. ¶¶ 6-7). Courts in this Circuit have found Plaintiffs' counsel to be adequate class counsel in wage and hour class actions in similar cases. (*See id*. ¶¶ 8-9). Consequently, the Rule 23(g) requirements are satisfied by the appointment of Pelton Graham as class counsel.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiffs respectfully request that this Court issue an Order certifying Plaintiffs' proposed class pursuant to Rule 23 of the Federal Rules of Civil Procedure with respect to Plaintiffs' NYLL claims, together with such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      January 15, 2021               **PELTON GRAHAM LLC**

By: ___/s/ Brent E. Pelton_____
Brent E. Pelton (BP 1055)
Taylor B. Graham (TG 9607)
111 Broadway, Suite 1503
New York, New York 10006
Telephone: (212) 385-9700
Facsimile: (212) 385-0800

*Attorneys for Plaintiffs, the FLSA Collective*
*and putative Class*